Ms. Youngman May it please the Court, I'm Julie Youngman from the Southern Environmental Law Center and I represent Defenders of Wildlife and the National Wildlife Refuge Association. We're here on de novo review from a case before the Eastern District of North Carolina. The fate and the future of Pea Island National Wildlife Refuge is at the heart of this case and because Section 4F of the Department of Transportation Act of 1966 imposes such stringent and mandatory protections for wildlife refuges and because the defendant agencies in this case have so clearly violated some of those requirements, I'm going to start my argument there. In this case, the North Carolina Department of Transportation and the Federal Highway Association are proposing to build only one small part of a 15-mile highway project and that's a bridge into a National Wildlife Refuge that's located on an eroding, fragile, thin ribbon of island in North Carolina's Outer Banks. As I think this Court described a similar project in the Maryland Conservation Council case and Justice Black described his dissent in the San Antonio case, the bridge is standing like a gun barrel pointing into the refuge. In this case... Do you take issue with the bridge itself as the best alternative in this regard or are you taking issue with the rest of the plan in terms of the other phases of the project? Most of the other phases of the project. So I think all the parties in the case recognize that Bonner Bridge is near the end of its service life and needs to be replaced. But the way that the parties, the defendant agencies, have gone about selecting an alternative violates federal law and that's the NEPA, National Environmental Policy Act, but especially 4F. In this case, it's a very... Oh, I'm sorry. I'm sorry. And your contention is essentially that the Pamlico Sound alternative is the better alternative? We're, again, not here advocating any particular outcome in the case. We do have a strong inkling that if the laws were followed, that the Pamlico Sound bridge alternative would not have been ruled out as not prudent. Even though the whole merger team agreed to the contrary in 2007? So that is not actually what happened, Your Honor. And in 2003, the entire merger team of all the agencies that will have to issue state or federal permits agreed actually to the Pamlico Sound bridge alternative as the sole alternative to be brought forward. But that was earlier. Right. And Governor... They revisited it. They revisited it, and in 2007 could not come to an agreement. And, in fact, let me find my... And it's in the joint appendix. I thought they all agreed, but that's... No, no, no. When they could not agree, and quite a few of the resource agencies didn't agree to it, the merger team resolution board, consisting of just four agencies, picked a different alternative. And Governor Easley's secretary of transportation actually explained the decision at the last point at which all the merger team agencies agreed. He said the parallel bridge options are no longer viable due to recent trends in shoreline erosion, ocean overwash, and conditions like that. Thank you. So our main concern... I have a question on the condition of this bridge. So what if they had selected phase one as it is with this bridge, and in one of those alternatives from 2005 and 2007 where they had those supplemental drafts, would that have been okay? Excuse me. If they had picked the bridge in the location where the current Bonner Bridge is and then one of the alternatives that they had fully studied, they would have come a whole lot closer to viable. They would have probably... That would have satisfied NEPA. I think it still would not have satisfied Section 4F, and that's why I want to start with that. In this case, the main problem is that they... Let's keep that simple. Okay. I know 4F is limited in terms of where it reaches with Department of Transportation, as I understand it. So this is dealing with the NEPA requirements. And so if it had the 2005 or 2007, one of those would have been fine. Is the problem that you can't tell as to whether it's going to stay within that easement? Right. NEPA requires a record of decision to actually announce a decision. I think this is the only time in my career that I have seen a record of decision announce an intention to, at some point, at some later point, make a decision about what the project is going to look like. Your point is not that it can't be done, it's that they didn't tell you what it is. It's left it open. So what keeps us from saying, okay, put the bridge up, but we don't approve that aspect of the second part of it because you haven't articulated anything, and that's still subject to an EA. And that gets at the heart of why segmentation is a problem and illegal. If you have a project that you have for the life of the project, as a transportation agency defined as going all the way from the end of Bonnie Island to Rodanthe, past the refuge, and you've said over and over again that the bridge by itself will not satisfy the purpose and need of the project. It will not be able to stand alone. It will necessarily require later projects to be built to keep an access road open to it because a bridge without any ability of traffic to get to it is a useless bridge, and it's a bridge to nowhere, and it doesn't serve the people that it's designed to serve. You're defeating the dual purpose of NEPA. Should the later analysis only be reflected with respect to the other phases of the project? In other words, you've agreed upon the bridge, but then you just need a further analysis on the other phases? No, Your Honor. Okay. So NEPA requires a decision on an entire project. The Federal Highway Administration has its own regulations that say you can't do a partial project. Are we starting over? Are you asking us to start over? The transportation agencies to comply with federal law need to pick an alternative that satisfies the entire purpose and need, and because the people of Dare County and North Carolina are counting on this bridge to provide reliable access for the life of the project, they need to not hide the ball and not hide the true costs and impacts and downsides of the full alternative. So they need to pick something that satisfies the entire length of the project. So basically you're saying we can't just say the bridge is okay because, as you say, that would be segmented because of the others. But could we say the bridge is okay, subject to the court making a determination as to one of these alternatives that fits within something that's been studied? The court actually dictating which of the alternatives would be? Not dictating, but determining, you know, the parties. Maybe the other side, once we make that subject to it, they know it cannot be built until they pick an alternative. In other words, the court perhaps has a remand to evaluate those alternatives and more fully develop the record. Right. I think on remand what needs to happen is the record of- Is that an acceptable alternative? I mean, outcome for this case? If I'm understanding Your Honor correctly, I think it could be so long as the agencies- You said it earlier that if you'd pick one of the 2005-2007 alternatives, then you would probably have met at least NEPA. Right. So it has to be from that perspective, would you not say? Right. So my full answer, Your Honor, was going to be that probably is okay as long as they're required to comply with Section 4F at the same time because that is still- that's not a procedural- I wanted to kind of- maybe because I've just got to understand there's a little simplicity merging the two. I want the 4F to kind of be different because that's dealing with the refuge in a whole different light, and you've got to prove it's another stuff there. So that's why I wanted to kind of get that aspect of it together. So the record of decision needs to comply both with unremand, must be vacated, and then it needs to comply both with the requirements of NEPA and not be a segmented project, but they need to evaluate and consider an entire alternative. And then it has to also comply with 4F. And so if I could spend a few minutes on the requirements of 4F and why that is so important. Congress- I'm sorry to belabor this, but I'm a little bit confused now because I had understood, perhaps incorrectly, your argument somewhat differently. So in response to the questions from Judge Winitch's child, you seem to be saying that the bridge is okay. We could say that the bridge is okay, but remand for more thorough consideration of the alternatives, and that's not segmentation? I'm sorry if I'm not being clear. On remand, the agencies will have to comply with NEPA and not commit segmentation. So they can be directed to pick a short bridge alternative, but they're going to have to consider it in full, and it may well be the case that when they consider the full impacts and full cost of any one of those alternatives, they may, in fact, revert to the Pamlico Sound alternatives or there's been proposals of shorter causeways. Or revisit the bridge? I feel that the agency has to be left to comply with NEPA itself. You would understand, I guess, that we couldn't write an opinion that directs a court or an agency to comply with NEPA. And what I'm trying to understand is how the bridge fits into what you would see as an acceptable remand under the statute. I'm not sure that the court has the authority to direct the outcome of a NEPA process. If you could just answer my question specifically, and drawing from the questions of my colleagues, what would an acceptable remand look like that wouldn't segment but would say that the effective bridge needs to be addressed? I don't think that this court has the authority to direct the outcome of a NEPA process, so I don't believe that the court has the authority to direct them to select an alternative with the parallel bridge. That's not my question. I'm not understanding your question, Your Honor. I understood the questions directed to you to be to recognize the practical reality of a structurally deficient bridge. Yes. And that there seems to be general agreement that something needs to be done about, and you referenced that when you were discussing the residents of Deer County. So it would go back, as I think the questions anticipated, to remand it to the district court to say there is a need to accommodate the structural requirements for remedying the defective bridge and that given taken into consideration in articulating the requirements that flow from that and considering the options that flow from that. But that, to me, sounds like the segmentation that you would object to, and that's my only question. Yes, Your Honor. So, as I was saying, I think this court can direct the agencies to address the problem of the defective bridge, but I don't believe that this court can tell the agencies which alternative to pick. And I know that you're not saying that, but . . . There was nothing in my question, I don't think, or that I intended to suggest that. But my question was, and perhaps we shouldn't spend any more time on it, is that it would seem to me that you would find that to be segmentation as well. Yes. But I'm thinking you're just not communicating as clearly, and I'm sure it's my fault, so . . . Your answer is that it's not segmentation if one of those alternatives that's been studied is picked. And if we send it back and say subject to the fact, because you've not said, which one, where they're going. And that is . . . It's going to be okay, but you've got to pick one of those studied ones, and if you pick one of those studied ones, there's no segmentation. That's right, Your Honor. As long as . . . You can just incorporate Judge Wynn's answer. I now understand. Thank you. Okay. As long as they . . . You can certainly direct the agencies to address the defects of the bridge, but they have to be free to do a NEPA process that fully and fairly considers alternatives for the entire length of the project. And they can also then incorporate their prior study, which is to have the Phase I parallel bridge, if that's already been done. They need to pick an alternative that addresses the entire length of the project and not one small segment of it. And the segmentation problem also bears on 4F. And in enacting 4F, Congress recognized that national wildlife refuges are a precious resource of the nation, and this Court actually recognized that also in the Audubon Society v. Navy case. And they enacted 4F to prevent harm to refuges from highway construction projects. And an agency cannot build a construction project through a refuge unless two things are true, and these are not procedural. These are absolute substantive requirements. So what's your standing to talk about this issue of ownership in the refuge on 4F? What is the standing? What is your standing? Do you have standing to do that? We do. My two clients are two conservation organizations whose members submitted affidavits at the district court that show their interest in the aesthetic and environmental and recreational values of the wildlife refuge and were found to have standing by the district court. So if I could, the first in the couple minutes. This applies to the Federal Highway Administration, not to the state, the 4F? Yes. It's primarily a requirement of 4F. The project, as it's described and presented by the Department of Transportation, has to comply with 4F, but the obligation is on the Secretary of Transportation and the federal government, the Secretary of the U.S. Transportation, to comply with NEPA, and they cannot. Because it looks like that joint planning exception turns on the issue of easement. I don't see anything in here about state law, North Carolina state law, which typically that's not a federal question in terms of real estate. There's no analysis in terms of the easement here. The way that that ties into 4F is that there is an exception to the requirements of 4F, and those are very specifically that you cannot build a road project through a refuge if you haven't picked the alternative that causes the least overall harm. And by not picking any method at all, they've left themselves open to pick even the most damaging alternative. And they've also left open the possibility of introducing new ideas, like a seawall or jetties along the refuge or some other way of hardening the shoreline of the refuge that would absolutely be incompatible with the refuge. So they've left themselves open to implementing the most harmful of the alternatives. And the reason it matters whether this joint planning exception applies is that if they don't have to comply with 4F, they will be able to escape and avoid all obligation to protect the refuge from harm. The joint planning exception is a matter of federal law. It says that 4F does not apply to protect a wildlife refuge if a road was formally reserved at or same time that the refuge was created. And the agencies have talked some about vehicles using informal pathways and driving on the beach and driving on private roads. But that's not the same thing as a formal. You're having a hard time finding out how that exception applies here, given what is required for it. Right. The refuge was created 16 years before the federal government formally granted an easement for the state to build NC Highway 12. And any private driveways or whatever might have existed before that do not constitute a formal reservation of a road by the federal government. And so that is just a red herring. That exception doesn't apply. And 4F does impose that obligation on the agencies to pick the alternative that will cause the least overall harm. And that gets me back to a question I had earlier. A transportation project can only use the refuge if there's no prudent and feasible alternative. And the project includes all possible planning to minimize harm. And below, I thought you argued that the district court incorrectly determined that the feasible and prudent alternative, the Pamlico Sound Bridge, was not available. Was that not correct? That's right, Your Honor. And I notice that I'm out of time, but should I? You've taken up a lot of your time. Okay. So I think that may have been why I was struggling so much with the questions before, is that while one alternative might not be illegal segmentation under NEPA, there's this very substantive requirement of 4F that says, as you said, Your Honor, you have to pick the method of building the transportation corridor that causes the least overall harm. And it has to not be potentially replaceable by a prudent and feasible alternative that wouldn't use the refuge. And that's why one of these parallel bridge options with a road through the refuge may not satisfy that. They need to pick a method and then fairly compare its costs for the entire route to other options like the Pamlico Sound alternative. I understand you to be challenging the determination that a feasible and prudent avoidance alternative. So don't you have to at least put one in play? Yes, Your Honor. And wasn't that the Pamlico Sound bridge alternative? Yes. That's one of them. We've also discussed refuges. And in the very last pages of the joint appendix, there's discussion of a seven-mile causeway that would avoid half of the refuge. And those are all ones that will cause far less harm to the refuge. But, yes, the main one that the agencies have long recognized will not use the refuge in any way is the Pamlico Sound bridge alternative. And I think we pointed out in our brief, and I can point out again, the selected alternative has an estimated cost of $615 million to $1.5 billion. It's a really broad range, and that's because they have left themselves open to building everything. And the Pamlico Sound alternative is within that range. And what I thought the district court relied on was that the Pamlico Sound option required a lump sum payment, whereas the alternative under consideration could be paid over time. Yes, Your Honor. And while that is what the district court held. Is it clearly erroneous? I believe it is, Your Honor. Right now the agencies are not only building and considering the first bridge that we've all been talking about is the parallel bridge, but they are currently planning and building two additional bridges of two to three miles apiece within the refuge. And the sum total of all that cost is going to be in the range of $600 million. Is that in the record? That is in the record, Your Honor. It's, I think, Joint Appendix 2718 and 42. It's certainly in our briefs, too. Actually, I have a clear understanding. Feasibility is not at issue here. It's prudence. And in the district court's analysis, even with the Pamlico Sound alternative, they never did crunch the numbers, never looked at the alternatives on it. So I'm not sure what we can do with that at this point. I don't think we can do it. So I don't know where we go with that in terms of that as an alternative. On the map it looks like a pretty place to put a bridge, but I don't think that's the basis for doing it. You've got to crunch the numbers. Right. And so the last time that the agencies crunched the numbers on any alternatives comprehensively and put it in the record is 2006. And those are the numbers I was talking about. They've said the selected alternative would be in this broad range, but when they get to the district court, they're just comparing the first bridge to the longer Pamlico Sound bridge. It sounds like a lot of money. I think we should use numbers that are seven years old and make a decision on the pellet level. That's right. Those numbers are outdated and they never fairly compared the selected alternative to the Pamlico Sound bridge alternative. They had ruled that out long ago. And just as a final point, this court and Coalition for Responsible Development, it's a fourth circuit case, specifically said you can't rely on the vagaries of state law and your ruling out an alternative. You have to look at all available alternative or funding. Thank you. Time for rebuttal. Thank you very much. Mr. Lundman. May please the court. Robert Lundman representing the federal highway administration. I'm going to use five minutes of argument on me. Mr. Madry for the state of North Carolina. We'll use, I'll use 15. He'll use five. Yeah, that's it. It's not right. So I want to jump right to the start off with segmentation. You're going to get a lot. He's going to get a little. Exactly. The final environmental impact statement here did not just look at the Bonner bridge. It looked at replacing the Bonner bridge, the option for the bridge through the sound, the long bridge option and all the different potential alternatives through for highway 12 down to Rodanthe. Then, and this is where a plaintiff's argument kind of cut off. Yep. You did do all that, but that's not what your final plan says. You're not going to look at the ones. You're not limiting yourselves. The one just studied beyond that bridge bridge has been studied. And the rest of it is like, well, we're going to figure out what goes on from this bridge down the road. But then right now, plaintiffs and others made that very complaint after the final EIS before this lawsuit. That's what your statement says. Well, I was going to tell you the rest of the story. Okay. After the final EIS, then we get the environmental assessment, which is another big environmental analysis of this issue. And that's where the agencies here set forth in detail what the transportation management plan means for highway 12. And so it just, do you have a transportation management plan in this record? We do. It's a, so that's, that's in the environmental assessment in volume five. I did not bring that. So you will maintain, you have a transportation management plan. I know there's a letter in this record. That's the selected alternative that the agency chose replaced the Bonner bridge. I got a selective alternative, but do you have a transportation management plan in this record? Use those things are real thick. Well, it's, it's, it's the, it's for this, for this Brit, for this highway 12. And it describes all the different alternatives that the agency considered and, and, and what they're getting, what could they choose from now? So far so good. We have an analysis of the whole, the whole picture here, bridge down to Redanthe. We have an analysis in the EIS and the further analysis in the EA. Then what we have is in the record of decision, the agency finally decided what to do here. And that's where it did its first phasing and phasing is different than segmentation. The agency here decided we have the money. The agency is to fund the replacement of the bridge, and we're going to choose the transportation management plan for highway 12 for the other alternative. So by making that choice, that phasing choice in the record of decision, Confused about this transportation plan. You're going to choose it. So what, what are you disclosing so the public and everybody can know what's going to happen beyond this bridge? The environmental impact statement in the EA discloses all of the environmental impacts beyond the bridge. It talks about the impacts of nourishment. It talks to you about the impacts of a short replacement bridge. It talks about the impacts of longer replacement bridges. Those documents do the hard selection. Well, the selection time is at the record of decision. The environmental impact statement in the EA don't make selections. Selection occurs at record of decision. And you're right at selection time. They said, replace the bridge and continue this plan for the lower part. And the plan is going to provide for additional study and further analysis. And that, and this is where their legal argument just completely collapses. There's no cases and nothing that says agencies can't phase in the decision. As long as they've done the analysis on the whole thing, they can pick a phase and implement it and then do a later phase and implement it. But I think the, the concern that's being articulated is when you say you're going to face something in, that implies that you have a, a plan laid out. And the concern is that you're making assessments as you go along. Not toward a predetermined pre-considered end. Well, it's not predetermined here. All those options are, that's the point, right? Well note it, but you can do that. I think this is the key. This is the key point. You have to do a full environmental analysis of the impacts and the effects. But when you come time to choose what you're going to do,  to make, to implement only part of what you've studied. If you study the whole thing, you can implement part of it now and part of it later. When it comes time for the later implementation, then you have to do one of two things. You have to say, we've already studied this. This is covered by our prior EIS and EA. We're just going to go forward with another record of decision, or you have to do further NEPA analysis. Is the EA limited just to the easements? Because the, the environmental impact statement is limited just to the easements. Is the EA also limited to it? Neither of them is limited just to the easement. They both study alternatives that are outside the easement and in the easement. The final environmental impact statement, for example, as a thorough analysis of their preferred all the way through the sound alternative. None of that's in the easement. That's all for the sound. Limited to the easement, the final impact statement, but I don't think the assessment is. The environmental assessment. And the problem is of course, with that is, you know, before you issue a record decision on anything, you ought to have a preferred alternative. It seems out to me. And there is nothing here. One other, there is a preferred alternative. What there isn't is a choice exactly how to implement the later phases. And that's okay. It's not segmentation. If you've done the hard environmental analysis, where it is. I mean, if you have a choice to implement, that's not disclosure. There's no, we'll never know something. I mean, that's a reason for NEPA is a procedural type thing, but it's like in the public entitled to know this. And the public, that's what we did. The environmental impact statement, EA, what do they know? They know that you can look through the environmental impact statement. Say, what are the effects? If we keep the road on the ground in the easement, that alternative, there's an analysis then of how that affects the environment across all the environmental considerations in the, in the wildlife wreckage. Then there's analysis. What if we put this whole area in the easement on bridges called the total bridge. So we don't have to have any consideration of costs of any of those. Oh, no, the costs are concluded too. And that's the about that. It doesn't matter. You can have it on the ground or wherever. You don't have to put that. Just say, it's going to be one of these. That's good enough. Well, NEPA doesn't require NEPA. You don't make a choice when you're doing this. You disclose, right? And what I'm saying is the disclosure is all there. If you look at the record, it's in the EIS and it's in the EA. There's no law. The C looking for that, that, that TMP. Okay. No, no, your partner can bring them. Tell me what that is, because that's kind of where this is. If that thing is disclosing something, I want to know what it is. Cause I can't find it. And, and I, the other point I want to make it here on this issue is the, the law, the CEQ regulations on this say that cumulative and connected actions must be considered in the same impact statement. And that's what we're talking about in the impact statement, not in the rod, the 11th circuit's decision and defenders of wildlife versus United States Navy is directly on this point there. The Navy analyzed both the construction of an undersea, underseas warfare training center and the operation of the warfare training center in the environmental impact statement. So just like here, impact statement looks at the whole thing. Then the Navy said, what we're going to do is just implement the construction. We're not going to implement operation yet. And so the rod was limited or phased just like the rod is here. And the 11th circuit said, you know, limiting the rod in that way, just simply does not implement NEPA segmentation concerns. And that's exactly the argument we have here that the 11th circuit has ruled on recently. Could I, could I go back for just a moment? Um, when Ms. Youngman stood up, she spoke in terms of our consideration of NEPA as a matter of law. And of course we review questions, um, of law de novo, but what about the district court's decision? What wasn't the district court's, um, standard of review just simply to see whether the agency's action was the arbitrary, capricious, right. Now that's abusive discretion, otherwise unlawful, the highly deferential standard that is given to agency decisions. Exactly. That's how the district court reviews the record. And that's how this court reviews the record de novo. So it doesn't rely on the district court opinion, but it's this court's de novo review is that arbitrary and capricious standards. So this court should review with that deference in mind, what the agencies did here. Um, so you have a, do you have a problem if, if, uh, we said, okay, uh, bridge makes, meets the NEPA requirements here. Uh, but we're going to send it back. Of course, but we're going to make it subject to the fact that, that essentially those little extra things are going to be those that you have already studied. In other words, we'll make it subject to what you have studied. I don't think you have to do that because I think that's where we are. That'd be okay. That would, I think, I don't think it's okay because I think it's inconsistent with NEPA because the agencies here have already done that. They've done the full environmental analysis and the EIS. It said just limited to those, what you've done, the full analysis and you've done all the studies that are necessary for these alternative groups. Right. So those are the only ones you consider. You can't come up with something you haven't studied. Subject to the agency can do further studies. Of course, it's not locked in at all time to 2007. It could do a further study, a further environmental assessment or a further supplemental environmental impact statement, and then make a choice after doing something else you need to disclose. Right. And that's what we're doing. That's what's happening. That's what's happening in phases two, a and B. How would you do it now? They're doing it because, well, the record explains this exactly why, why this is the case. The it's hard to make this choice because of the dynamic nature of this island. The land is moving. No one knows for sure where the next storm is going to hit, where a breach might or might not occur. And the analysis of this goes out to 2060 and explains. It's not possible to precisely forecast where those impacts will be. And so we can't know right now where the money will need to be spent. It doesn't make sense to spend $300 million where there might not be a breach. Procedurally. Were we to remand, it wouldn't go, it would go through the district court back to the agency. Right. So it, we would simply be asking for you to do. Your argument is we would simply be asking you to do what you think you've already done. And then we would begin the track back up here again. Right. But we've already done and what we're already doing for the future phases. So we've already done the full analysis of the entire, entire area and we're doing future analysis as well as those, as those phases come up. I I'm, I'm into my, are you going to talk about for you? I would love to talk about four F that's the only issue for the federal parties. I'll just make a few very quick points about prudence here. The sound was the alternative to the long bridge. The sound was the alternative plaintiffs said should be determined by the merger team to be infeasible. In 2007. And is that subject? Is that a part of that? Subject to the arbitrary and capricious standard of review. Yes. It's subject to the deferential review. This court has made clear that those sort of technical. Cost forecasting items are subject to particularly deferential review. It was about. Do that. The district court wouldn't actually conduct the financial analysis. Fresh. It would not. And the agencies did the financial analysis here and the issue of prudence is in the record before us. It is in the record before this. We've cited both. In the four F evaluation, the revised final four F evaluation. There's a thorough financial review. There's federal highways, independent look at that as well. 207. J 207. I don't. 2007. No, that was, it was later. It was the revised final four F evaluation was in. I think 2009. Or early 2010. To. And, and, and the comparison here are between the sound alternative and the parallel bridge. I think, you know, if you look at the right, the same number. So through 2060, if you look at both the low estimates or the high estimates, it's clear that the sound alternative is more expensive compared to the, to the other options. And the phasing, as, as, as the court pointed out, all that money is due up front for the sound bridge in order to replace the bridge while here we're can do phasing, see what needs to be done over time and spend that money when the time comes up. I can address joint planning really briefly. If, if the core is interested or leave time for. I'm just trying to understand in terms of this has been going on quite a while. It goes highway 12. And this bridge is always a continuing problem down there, but. I guess it just looks to me. I'm wondering why they're just not bridges being built down there. As you said, you got this continuing shifting of the coastline and in one of the alternatives, you've got parallel bridges. You've got the Pamlico sound bridge goes out water. You've got all these things that I'm trying. And then you've got the hotspots. You show on it and the whole bit. And I'm just trying to figure out what, how did this all fall apart in the process of it? There must be some other considerations here, developers or somebody that's shaping this thing. And I know this is a policy question, but I it's, it's really not. I'm not following what's going on here with the past. It's not going to stay up. If it's on the ground, we all know that it's right. Renourished or something has to happen. I mean, you can't keep highway 12. So if you put it up in the air, it seems like a bridge might stay. I don't know. Right. And that's what the analysis here shows is we need to replace the bridge. The environmental planning here started in 1990. I know, I know the bonnet bridges and, and then through the talk about that area, right? South of the bridge to Bernanke. And that's where, that's where there are lots of options on the table with complicated pluses, minuses of each of them. And that's where the agencies are saying, look, we are going to keep studying what's happening to these islands. And we're going to make decisions when the time is right, rather than sink all the money. And now plaintiffs are saying, you need to make a decision. Now you need to do the whole thing now. And that's not right. We need to do the entire analysis now of the environmental impacts, which we did. We don't need to make a decision on the money and where the bridges are built. Now that we can wait and update the analysis, see what happens. And then, and then make a decision down the road. We're not in a position to say, okay, but you ought to at least have, you got all these things you've studied and you say you've studied. You're subject to those things you've studied. If you want to do something else, then you got to go back through the procedure again, you got to do something different. If we do something that we haven't studied, we have to go through the procedure. That's what NEPA says. If we do something, we've studied, then we're okay. And that's the scope of where we go with this. This is okay. What you've got so far is fine. As long as you stay within what's studied. Right. And that's, and that's the point is we've, we've studied. If we choose something to do, that's not been studied, then we have to do an environmental impact statements outside about. Oh, right. And I think, but, but I guess I'm still confused. I asked the question. What's wrong? If we said it, say, okay, fine, but you got to stay within the alternatives you've studied. Because nothing prevents the agency from coming up with a new alternative. Studying it. What we see is fine subject to that. Now, if you want to do something different, once you get out, you got to get outside of this and find a way to do it. But you can't do it within the confines of our opinion. We're not saying this is the only way, but we're saying that for what you've asked us to do, this is fine as long as you do what's been studied. That keeps it from being segmented. What I'm saying is you can affirm, you can uphold the agency decision, because what's happening now is exactly what you're describing. If we do something that's not in the alternative, there's further review. Yeah, yeah, I, I, I think I understand. You're saying that we would be telling you to do what, go back and we order you to do exactly what you're doing. Proceed along the lines that you've already studied and laid out. And if you deviate from that, then, then review gets triggered again. Right. Right. And I think that's a fine statement of NEPA law. So if the court wants to put that in the opinion, I think that's, that's, that's fine. I think it's clear. That's kind of what I was asking. Right. I guess the point is, I don't think that means you need to reverse. I think that means you affirm. Affirmation. Affirmation. Affirmation. Well, I'm all, I'm all for affirmation. Affirmation. It doesn't give you this open opportunity to go out and just build something you want to build. Right. What you've studied. Right. One of those alternatives. Okay. All right. I have nothing further unless the court has questions for me. Thank you. Thank you very much. Mr. Madry, come and enlighten us. May it please the court. I'm John Madry, Solicitor General for the state of North Carolina. I'd like to start by emphasizing what I understand to be the selected alternative, and that is the parallel bridge corridor with the NC-12 highway management plan. And I think that's important, Judge Winn, because it goes to your question. What the decision after the 20-year environmental process, study process was, was to determine the corridor within which the highway bridge replacement and highway issues would be addressed. And that was the parallel bridge corridor with the future transportation management plan. Is there a complete total transportation management plan in the record? No. There is the environmental assessment, which is. Tell me, at some point in time, I would like to know where it is in the record. That thing you call. That's a term of art. Yes. Yes, it is, Your Honor. I want to know where it is. I didn't see it. I'll try to help you out. The environmental assessment, some 300 pages, is in the joint appendix at pages 2151 through 2455. That was a, I believe, a May 2010 document. The December 2010 record of decision is at joint appendix pages 2482 to 2756. Of particular note, Your Honor, is at joint appendix page 2497 through 2500. That's the three-page section of the record of decision entitled, Later Phases, NC-12 Transportation Management Plan. No, it is not a 300-page complete transportation management plan. What it is is the description in the record on decision as to where and how things will proceed after phase one. It's important not to equate phases with segmentation. Basically, is it just a few little pages you're talking about here? This transportation management plan is a couple, two, three little pages? Your Honor, as I said earlier, it's not. I've never seen one like that before. You know their thing. You know what they are. I know exactly what you're talking about. What I have described to you is the decision-making process for the parallel bridge corridor with the transportation management plan. Phase one, build the replacement for the Bonner Bridge in the parallel corridor. To go where? To the refuge where no one lives. To connect the two islands, the existing transportation corridor that's been there for close to 75 years. There's nothing out there in that refuge. It's no good unless it connects with Rodan, down the road. So you've got to have something to connect that. Otherwise, you've got a bridge to nowhere. Your Honor, it replaces an existing bridge, so it's not a bridge to nowhere. It connects existing highway. Highway 12 there, but you know Highway 12, the next hurricane is gone. Well, and that's a very good point, Your Honor, because opposing counsel talks about the bridges now in phase two that she says add up to a certain amount of money. Those bridges came after the record on decision when Hurricane Irene came through that area. So that validates the process that's approved in the rod. We can't tell you exactly what we're going to do in that corridor because we have to wait until it's time to do them to know what's best. There could be bridges. There could be one or more bridges. Will you stay within the easement? The approved alternative stays within the corridor, the Highway 12 corridor, and that's by definition down the barrier island. Corridor easement, will it stay within the easement? I know this Court didn't talk about North Carolina law at all on this thing, and I thought that probably we should talk a little bit about North Carolina law because it applies on easement, but I know you say corridor, but what are you telling me? Is it easement, is it staying within the easement, or is easement corridor? I don't think the two are synonymous because, as the record indicates, over time there have been instances where the path of Highway 12 has been moved with the approval and acquiescence of the Department of Interior and the management entity, the owner of the federal lands upon which the road is located. So I don't believe easement is synonymous with corridor. I think corridor is broader than the existing easement. Again, that illustrates the point of the approved alternative, the selected alternative, is to allow that sort of flexibility and reaction when it's time, when there's money to do it and there's time to do it, to make the complete connection between the north and the south. I see my time is up. I would encourage this court to affirm the judgment of the district court. Thank you. Thank you very much. Ms. Youngman, you reserve two minutes for rebuttal. Yes, Your Honor. I'll just address a couple of the questions that you've raised and that my colleagues have talked about. The first thing I want to distinguish is the treatment of the Defenders of Wildlife versus Navy case that talked about phased implementation. That's a very different thing, and I think, Judge Nguyen, you may have pointed this out. Phased decision-making is not allowed under NEPA. You have to make a decision up front. You can implement the decision in phases if you'd like, and in that case, that's what happened. They have a plan for the entire construction of the entire structure, and they're just going to implement it later, and that's okay. Just to nip, I think I would agree that segmented isn't because that seems to imply that you're deciding phase to me, unless it's a term of art and you can correct me if I'm wrong. You implement something in phases that has been predetermined. And that's what didn't happen in this case. Nothing has been determined except that one small segment, and I'm going to read to you some of the description of the transportation management plan that you've been interested in. It is a couple of pages of the record of decision. Is that a transportation management plan? It is a plan to at some point in the future we'll make a plan. It's not a plan right now. It's a promise to at some point figure out what we're going to do. Does it meet within the term of art that's used in the language of transportation management plan? Because we're talking about disclosure to the public. Right. Really, that's what this is about. And here's how they describe it, Your Honor. It says, and I'm reading from those pages, one or more of a combination of options, drawing from the alternatives previously studied, as well as any other alternatives determined at the time to be reasonable. The sky is literally the limit. They can pick, and EPA actually asked them to take one option off the table, the one that was the most environmentally damaging, that would have moved the bridge. And to your point, Your Honor, about easement versus corridor, this is something that would take the road completely out of its easement, destroy dozens of wetlands within the refuge, and the agency said, no, we're not going to even take that one off the table. So they literally have left themselves the opportunity to implement anything, even the most expensive and the most damaging. And that is not what the people deserve. The public is supposed to be able to participate and scrutinize an entire plan. And if you build the first bridge with no plan to get traffic to and from it, I mean, as we've seen, every time there's a hurricane, it's not the bridge that stops everything. It's the fact that the road is washed out for two months that keeps people from getting on and off the island. So if you don't have a plan for those later phases, it's not a plan, and you can't ask the people to – I mean, you're hiding the ball on the people and the other agencies that need to make decisions. Thank you very much.
judges: Allyson K. Duncan, James A. Wynn, Jr., J. Michelle Childs